## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ROBIN NOLAN,

      Plaintiff,

                                Case No. 3:23-cv-1205-TJC-LLL

v.

ST. JOHNS COUNTY SCHOOL
BOARD,

      Defendant.

_____

## O R D E R

**THIS CASE** is before the Court on Defendant's Dispositive Motion for Summary Judgment, Doc. 30. Plaintiff, Robin Nolan, has sued her employer, the St. Johns County School Board, complaining about mistreatment while she was a teacher at St. Augustine High School (SAHS), by the principal, DeArmas Graham. Doc. 16. Nolan has made four claims under Title VII and the Florida Civil Rights Act: Count I for Race Discrimination, Count II for Hostile Work Environment, Count III for Gender Discrimination, and Count IV for Retaliation.

Nolan describes a problematic series of events with a new boss. The question is whether those problems amount to a viable legal claim. Answering that question is harder than usual because the EEOC investigation lasted over six years, so most of the alleged incidents are now six to nine years old.

## I.    STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in the light most favorable to Nolan. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

## II.    FACTS

Nolan, a white female, started teaching at SAHS in 1998.[1] See Doc. 34-1 at 65-66. Nolan routinely took on other duties for extra pay, including coaching, being an activity sponsor, helping hospital or homebound students, tutoring, helping with tickets, and teaching summer school. Doc. 34-1 at 69-79. Around 2012 or 2013, Nolan started dating a Black coworker, Anthony Major, and by the 2015-16 school year, they were living together. Doc. 34-1 at 10-16.

The School Board hired Graham as SAHS principal starting in the 2015-16 school year. See Doc. 30-1 ¶¶1, 3. During that year, Graham asked Nolan

---

[1] Nolan currently teaches at Gamble Rodgers Middle School. Doc. 34-1 at 32 (deposition or statement page references are to deposition or statement page number, which may differ from the ECF page number). Nolan applied for the position with GRMS during the 2022-2023 school year in anticipation of the EEOC closing its investigation because she was concerned closure of the EEOC investigation would make things more difficult for her at SAHS. See Doc. 34-1 at 130. The year after Nolan transferred schools, the School Board moved Graham to an administrative role, Senior Director of Accountability and Intervention Services. See Doc. 34-2 at 6.

when she was going to get married about 15-20 times, including in response to Nolan's questions about work.[2] Doc. 34-1 at 90-91, 109; Doc. 34-4. Graham did not ask Major similar questions.[3] Doc. 34-3.

Teaching schedules for the next year were announced in May 2016. See Doc 34-1 at 101-02, 163-64; Doc. 30-7 ¶24. Graham delegated responsibility for the teaching schedules to assistant principal, Travis Brown, with instructions to base schedules on student data and student needs. See Doc. 30-1 ¶¶7-9; Doc. 30-7 ¶¶5, 9-10, 22. Before Graham was principal, teacher preference and seniority were a bigger part of determining schedules.[4] See 30-7 at ¶16; Doc. 34-1 at 34; Doc. 34-4 at 2. In 2015-16, Nolan was teaching pre-calculus and Math for College Readiness (MCR).[5] Doc. 30-7 ¶17. For 2016-17, Nolan's top three class choices were Pre-calculus (first choice), MCR (second choice), and

---

[2] For instance, in April 2016, Nolan and Graham met about having enough calculators for testing. Doc. 34-1 at 162-63, Doc. 34-4. In response to Nolan's concern, Graham asked when Nolan was getting married and when she responded that had nothing to do with the calculator issue, he told her to hold a fundraiser. Doc. 34-4 at 2.

[3] Nolan and Major were married in 2017. Doc. 34-1 at 13.

[4] For example, Nolan testified she waited several years to teach pre-calculus, until the prior pre-calculus teacher retired. Doc. 34-1 at 165, doc. 34-4 at 2. Neither party has argued, however, that seniority was required to be a factor in determining teacher schedules. See Docs. 30 and 35, passim.

[5] To assist with scheduling, teachers submitted information about preferred courses, certification, and could provide other comments (usually additional preferences or things to avoid). See Doc. 30-10 at 28-31.

Honors Algebra II (third choice). See Doc. 30-10 at 29. The initial 2016-17 schedule assigned Nolan all new classes and none of her requested classes.[6] See Doc. 30-7 at ¶¶20-21. This was eventually changed so Nolan was teaching one of her requested classes, MCR. Doc. 30-7 ¶21; Doc. 30-10 at 37-39. Nolan testified other teacher schedules were also changed, but she was the "only senior teacher whose honor classes were taken." See; Doc. 34-1 at 36; Doc. 30-10 at 17; Doc. 30-7 ¶¶24-26.

Nolan was upset about the schedule and met with Graham. See Doc. 34-1 at 86-88; Doc. 34-4 at 2; Doc. 30-7 ¶24. In that meeting, Graham responded to Nolan's questions about her schedule by asking questions about her marital status, including if the reason Nolan and Major weren't married was because of race, if she have ever been married to a Black man, and asked about the race of her children. Doc. 34-1 at 86-88, 102, 109-10. Graham also said living with her boyfriend was immoral and threatened to have her teaching certificate revoked,

---

[6] For purposes of summary judgment, the Court has presumed the schedule changes were significant, but the exact extent of the changes is not clear. Compare Doc. 30-10 at 37-39 (mentioning all new classes) with Doc. 30-7 ¶¶17, 21 (mentioning Nolan taught MCR in both years). Similarly, Nolan asserts she requested to not teach geometry, but the teacher preference form only mentions she does not want to teach Algebra 1, unless it is honors. Compare Doc. 30-10 at 38 with Doc. 30-10 at 29. The record evidence about teacher preference submissions appears to be a compilation of teacher submissions, rather than the individual submissions. See Doc. 30-10 at 28-31.

remarks that were overheard by Graham's secretary, Johana Linksey.[7] Doc. 34-1 at 101-04; Doc. 34-4 at 2-3; Doc. 34-5 at 2-4; Doc. 34-6 at 11, 13.

Further upset by the meeting with Graham, Nolan sought union help, and the next step was a meeting with Nolan, Graham, and the union president, Michelle Dillon, on June 6, 2016. See Doc. 34-4 at 3; Doc. 34-1 at 108. Graham admitted asking about Nolan's marital status 15-20 times, apologized, and said he would not ask again. Doc. 34-1 at 109; Doc. 34-7 at 12; Doc. 34-8. Graham was also rude, physically aggressive, and threatened Dillon. Doc. 34-7 at 12.

With Dillon's help, Nolan filed an internal complaint with the Equity Committee. Doc. 34-1 at 97-99; Doc. 34-7 at 15; Doc. 34-8 at 2. The Equity Committee investigated, but the investigation did not include Linskey. See Doc. 34-6 at 32. Graham's response to the Equity Committee admitted asking Nolan about her marital status (a single time) allegedly because at a school related event, Nolan had indicated she and Major were in an "open" relationship, and she could date whomever she pleased. Doc. 30-10 at 33. Nolan denied saying she was in an open relationship and thought Graham was defaming her character. Doc. 30-10 at 37-39. The Equity Committee determined the complaint was unsubstantiated but directed Graham to not ask about marital

---

[7] Linskey also overheard similar remarks from Graham to Nolan at least two other times. Doc. 34-5; Doc. 34-6 at 11. Linskey was not reappointed to her position after admitting to Graham she heard his improper remarks to Nolan. Doc. 34-5 at 2-3.

status.[8] See Doc. 34-1 at 91; see Doc. 30-10 at 35. Not satisfied with that outcome, Nolan filed a rebuttal to the Equity Committee, and in September 2016 filed a discrimination charge with the EEOC. Doc. 30-10 at 37-39; Doc. 34-13.

After Nolan's complaints, the School Board took steps to ensure Graham would not conduct observations or evaluations of Nolan.[9] Doc. 34-1 at 112; see Doc. 34-7 at 18. Even so, early in the next school year, Graham approached Nolan from behind, touched her, leaned against her, and whispered in her ear he was going to "come observe her."[10] Doc. 34-1 at 112-15; Doc. 34-4. Nolan reminded Graham he should not be doing her evaluation, and Graham said it was his school, and he could do as he pleased. Doc. 34-1 at. 112-15; Doc. 34-4. Nolan was so upset by this encounter she left school for the day. Doc. 34-1 at

---

[8] A former assistant principal identified at least seven women, in addition to Nolan, who complained about Graham. Doc. 34-19 at 14-23; see Doc. 34-20 at 10; Doc. 34-21 at 10-14. One other female teacher testified about similar personal questions from Graham, and after she complained Graham conducted an observation in her classroom but did not have a laptop or similar device with him during the observation and did not take notes. Doc. 34-21 at 10-16; Doc. 34-40. There is also evidence Graham yelled at Nolan and others, men and women. Doc. 34-1 at 56-59.

[9] Nolan expressed concern about retaliation for her complaints, so the School Board took steps to ensure Graham would not conduct observations or evaluations of Nolan while the charge was pending. Doc. 34-1 at 112; see Doc. 34-7 at 18.

[10] Nolan described Graham as a large man, capable of being physically intimidating, and another teacher testified Graham is at least 6'3" and 280 pounds. Doc. 34-1 at 112; Doc. 34-21 at 13.

112-13. When Nolan returned the next school day, Graham was waiting in her classroom to do the evaluation. Doc. 34-1 at 112-15; Doc. 34-15.

After this, Graham did not observe Nolan,[11] but Nolan argues she was treated differently regarding evaluations because she had more than one evaluator (less consistency), and in February 2017, one evaluator refused to discuss the observation(s) without Graham being present.[12] Doc. 34-1 at 139-41, 181-82; Doc. 34-14; Doc. 3-14. Nolan's rating went from highly effective to effective.[13] Doc. 30-6. There is evidence, however, that after Graham's first year as principal, the process changed to use multiple observers for all teachers at SAHS. Doc. 30-7 at ¶27. Nolan testified she did not know how observations and evaluations were done for others. See Doc. 34-1 at 50.

Other things also changed for Nolan. She was not picked to teach summer school at SAHS in 2017 and 2018, but was able to teach at Bartram High School.[14] Doc. 34-1 at 53-54, 67-68; Doc. 30-1 ¶14. Nolan did not have the same

---

[11] Graham attempted to observe and evaluate Nolan the next year but was reminded he should not. Doc. 34-33; see Doc 34-1 at 188-89.

[12] The School Board alleges it changed the observation process starting with the 2017-18 school year, and everyone had multiple observers. See Doc. 30 at 6; Doc. 30-1 ¶21.

[13] Nolan was rated "effective" for the four years before Graham was principal (2011-12, 2012-13, 2013-14, and 2014-15 school years) and the three years after her highly effective rating (2016-17, 2017-18, and 2018-19). Doc. 30-6. Evaluations for 2019-20 were waived due to COVID, and Nolan was rated "highly effective" for 2020-21, 2021-22, and 2022-23. Id.

[14] Nolan taught summer school at Bartram for two years after she applied

opportunities for roles with supplemental pay.[15] Doc. 34-1 at 6-67, 74-79, 210-11. She elected to not apply for any supplemental roles that involved meeting with Graham. Doc. 34-1 at 79.

Graham targeted Nolan or singled her out in other ways. At least three times, Graham tried to discipline Nolan but was unsuccessful. In September 2016, Graham opened an investigation because Nolan allegedly provided incorrect information in a parent meeting, but information from the parent did not support discipline. Doc. 34-1 at 171-75; Doc. 34-4 at 4; Doc. 34-15; Doc. 34-41; Doc. 30-1¶29; Doc. 30-1 ¶29. In January 2018, there was a meeting to discuss Nolan's Algebra 2 classes, due to a concern with failing students, but there were not similar meetings with other teachers who had failing students.

---

to teach summer school at SAHS. See Doc. 34-1 at 66-67. A google search indicates the two schools are 22 miles apart. Nolan alleges the Bartram assistant principal said he would not have hired her if he had known about the EEOC charge. Doc. 34-1 at 66. After teaching two summers at Bartram, she was not hired by Bartram (or any other school) to teach summer school even though she applied. Doc. 34-1 at 66; Doc. 30 at 12.

[15] These items are disputed by the parties and not clear in the record. Nolan argues SAHS had to post the position several times instead of hiring her. Doc. 34-15 at 2. Nolan says the process for some supplemental roles changed; she was previously offered a role to help with tickets and then not selected, even though she asked, or not offered tutoring roles. Doc. 34-1 at 74-78. The School Board argues she did not apply. Doc. 30 at 12; see Doc. 34-1 at 79. Graham approved all supplemental roles for which Nolan applied or was recommended. Doc. 30-1 ¶15. Graham admitted he did not hire her for summer school, citing the same reasons for the schedule changes – that her students were not prepared for the next level. Doc. 30-1 ¶¶ 12, 14.

Doc. 34-4 at 8; Doc. 34-34; Doc. 34-35; Doc. 34-37; Doc. 34-38; Doc. 30-1 ¶30. Several years later in 2022, Graham had a letter of improvement placed in Nolan's personnel file for missing a parent-teacher conference, but the letter was removed when it was determined Nolan tried to attend but had not been told of a location change. Doc. 30-1 ¶32; Doc. 34-39; see Doc. 34-1 at 173-75.

Nolan argues she was singled out with reminders to comply with various policies—such as use of hall passes or being at her classroom door during class transition—but others did not get similar reminders. Docs. 34-29; 34-31. None of this, however, resulted in discipline for Nolan and for the class transition issue, Nolan admitted she usually, but not always, complied with the policy (and gave reasons for not complying).[16] See Doc. 34-1 at 80, 175-79. Nolan began to experience anxiety based on actual or possible contact with Graham. See Doc. 34-1 at 79, 139-140, 189, 208, 217.

## III.   ANALYSIS

### A.   Race and Gender Discrimination (Counts I and III)

Nolan's race and gender discrimination claims require showing she was treated differently due to a protected characteristic. Nolan does not allege direct evidence of race or gender discrimination, so her discrimination claims are analyzed under the McDonnell Douglas burden shifting framework or she may

---

[16] In one instance Nolan disagreed with how Graham addressed her medical restrictions after surgery. Doc. 34-1 at 200-05.

establish a convincing mosaic of evidence to support discrimination. [17] McCreight v. AuburnBank, 117 F.4th 1322, 1334 (11th Cir. 2024) (noting "the McDonnell Douglas framework and the 'convincing mosaic standard' are two ways to approach the same question: whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination occurred.").

Under either paradigm, Nolan must show she suffered an adverse employment action and the adverse employment action was related to a protected characteristic. The Supreme Court recently addressed the standard

_____

[17] Under McDonnell Douglas, to establish a prima facie case of gender or race discrimination, a plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside the protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas, 411 U.S. at 802). "If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted). To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The evidence for pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (cleaned up).

for an adverse employment action for discrimination claims.[18] <u>Muldrow v. City of St. Louis</u>, 601 U.S. 346, 350-351 (2024) (holding the plaintiff sufficiently alleged an adverse employment action because of changes in her responsibilities, perks and schedule, even though her rank and pay remained the same). While a plaintiff must show "some harm" from the alleged adverse action, she does not have to show that her "injury satisfies a significance test." <u>Id.</u> at 350.

Specifically, Nolan points to the schedule change as an adverse employment action.[19] To the extent the schedule change could be considered an adverse employment action, Nolan lacks evidence the change was connected to her race or gender or that the school Board's reasons are pretextual. Schedules were changed for multiple teachers (and multiple teachers were upset), men and women, Black and white. The schedule was not developed by Graham, but by Brown, who did not have any problematic interactions with Nolan. Nolan

---

[18] The Eleventh Circuit has noted the change to its standard, but only in unpublished cases to date. <u>E.g.</u>, <u>Staple v. Sch. Bd. of Broward Cnty.</u>, No. 21-11832, 2024 WL 3263357 at *4 (11th Cir., July 2, 2024) (noting disparate treatment claims only need "some harm").

[19] Even under the <u>Muldrow</u> standard, it is not clear the schedule change at issue here is an adverse employment action. Class schedules for teachers change every year and such assignments are clearly within the discretion of the employer. <u>See</u> <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (noting the Court will "not sit as a super-personnel department that reexamines an entity's business decisions.").

has not provided evidence that Graham was specifically involved in her schedule or even that Graham was more involved in her schedule compared to his involvement with the schedule for other teachers.

Moreover, Nolan lacks evidence that School Board's reasons for the schedule change were pretextual. Deciding to base schedules on student needs and student data is within the prerogative of the school board (as delegated to Graham and then to Brown). See Murray v. Learjet, Inc., No. 24-11189, 2024 WL 4707968 at *2 (11th Cir. November 7, 2024) (affirming summary judgment for employer and noting that jobs assigned to plaintiff were already within his job duties and therefore not a change in his employment conditions).[20]

Generally, Nolan claims the "harassment, verbal abuse, unfavorable working conditions, discipline and forced transfer" are all adverse actions. Doc. 35 at 17. The allegations of harassment, verbal abuse, and threatened actions are considered as part of Nolan's hostile work environment claim. Nolan was not actually disciplined while working for Graham, so there was no adverse employment action based on discipline. Nolan's transfer to another school was voluntary and is, therefore, not an adverse employment action.

---

[20] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

Nolan's evidence about any connection to a protected characteristic, either gender or race, race is limited. Graham asked several questions related to race (whether Nolan had dated Black men before, if Major's race was why there weren't married, and the race of her children), in a single meeting. The one-time occurrence of such improper racial questioning, without further ramifications, is not an adverse employment action. Graham questioned Nolan more than once about her marital status and did not ever ask Major about his marital status. While this may show a difference in how Graham treated men and women, the inquiry about marital status is not an adverse employment action. Even if Nolan could establish an adverse employment action related to race or gender, she lacks evidence of pretext or enough to support a "convincing mosaic" and summary judgment is proper for her race and gender discrimination claims.

### B.   Retaliation (Count IV)

Nolan also claims Graham retaliated against her. A plaintiff may establish a prima facie case of retaliation by showing: (1) she engaged in statutorily protected activity, (2) she was adversely affected by an employment decision and (3) there was a causal connection between the statutorily protected conduct and the adverse employment action. Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006). Retaliation is a "but-for" causation standard. Gogel v. Kia

<u>Motors Mfg. of Georgia, Inc.</u>, 967 F.3d 1121, 1135 (11th Cir. 2020).[21] There is no dispute Nolan engaged in protected activity through her complaint to the Equity Committee and her EEOC charge, but the other requirements are disputed.

While <u>Muldrow</u> lowered the standard for an adverse employment action in discrimination claims, it recognized that retaliation claims require the retaliatory action be "materially adverse." <u>Muldrow</u>, 601 U.S. at 357; <u>see also</u> <u>Robinson v. Holman</u>, No. 23-11735, 2024 WL 2860221 at *2 (11th Cir. June 6, 2024). For an adverse employment action in a retaliation claim, a plaintiff must show an employer's challenged action would have been material to a reasonable employee. <u>Burlington N. & Sante Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006).

Loss of supplemental pay roles or being denied the opportunity to teach summer school would be adverse employment actions because each involves a tangible loss of pay. In contrast, Nolan's allegations about verbal abuse, physical intimidation, or attempted discipline, are not adverse employment actions in the retaliation context because they do not involve a material change in her employment. <u>See</u> <u>Muldrow</u> 601 U.S. at 357; <u>Debe v. State Farm Mut.</u>

---

[21] Nolan argues her only burden is to show the adverse action and protected activity are "not completely unrelated." Doc. 35 at 37 (citing <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1457 (11th Cir. 1998). Even though the <u>Wideman</u> language is fairly broad, the <u>Wideman</u> holding relied on timing - that "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge." <u>Id.</u> at 1457.

Auto. Ins. Co., 860 Fed. App'x 637, 641 (11th Cir. 2021) (citing Cotton v. Cracker Barrel, 434 F.3d 1227, 1233 (11th Cir. 2006)) (affirming summary judgment on retaliation claim because "negative feedback, unjustified coaching, and placement on performance management" were not materially adverse actions and did not cause plaintiff any "objective injury or harm, like a reduction in pay, benefits, or responsibilities."). The schedule change is not an adverse employment action because changes in teaching assignments are within the discretion of the School Board and affected multiple teachers, as discussed supra.

Even if the schedule change were an adverse employment action, it would not support Nolan's retaliation claim. Any alleged adverse action before her protected activity is not causally connected as a matter of law.[22] Debe, 860 Fed. App'x at 641 ("[I]f the alleged retaliatory conduct occurred before the employee engaged in protected activity, the two events cannot be causally connected."). Therefore, the schedule change itself and interactions with Graham in the meeting to discuss the schedule change (being called immoral and the threat to have her teaching certificate revoked) do not support Nolan's retaliation claim, because they happened before Nolan complained - her complaint to the Equity

---

[22] Similarly, activities that occurred both before and after protected activity, lack a causal connection to the protected activity (although changes in frequency or severity might indicate a causal connection). See Edgerton v. City of Plantation, 682 Fed. App'x 748, 750-51 (11th Cir. 2017).

Committee was about the schedule change and how Graham behaved when they met to discuss the schedule change.

Nolan lacks evidence of a causal connection between any other alleged adverse action and her protected activity. Nolan argues temporal proximity supports a causal connection because things were worse after her complaints. The Eleventh Circuit generally considers a gap of more than three months, without more, too long to demonstrate a causal connection. Chandler v. Sheriff, Walton Cnty., No. 22-13698, 2023 WL 7297918 at *2 (11th Cir. Nov. 6, 2023) (citing Drago, 453 F.3d at 1308). The alleged retaliation, however, occurred sporadically and infrequently for several years after Nolan's complaints. During this time, there were three attempts at discipline (one as late as 2022) and three written reminders about policy compliance. Nolan alleged only one incident after 2019, before she voluntarily transferred to another school.

Nolan taught summer school at SAHS in 2016, and then taught at Bartram the next two summers. Nolan has not established teaching at Bartram, instead of SAHS, constitutes an adverse employment action and decisions about summer school for 2017 and 2018 are well after her protected activity in 2016. Not being selected to teach summer school after 2018 is too distant and there is no evidence those decisions are connected to 2016 protected activity. Nolan complains about the loss of other roles with supplemental pay, but she did not apply for these roles and therefore the School Board is not

16

responsible for her failure to be selected.[23]

Nolan argues that Graham's pattern of intimidating behaviors after her protected activity (policy reminders, attempted discipline, etc.[24]) demonstrate sufficient changes to terms and conditions of her employment to support her retaliation claim. Nolan only cites three policy reminders over several years, and, in some cases, she admits to the lapse, but argues it was excusable. The Court is not persuaded that any of these actions were adverse employment actions (because they are infrequent and spread out over years), but even if they were, Nolan's retaliation claim fails because she lacks evidence to show a causal connection to her protected activity. Summary judgment is appropriate for Nolan's retaliation claim.

---

[23] In some cases, Nolan alleged there were process changes (she did not apply previously) but she lacks evidence process changes were related to her protected activity and therefore cannot meet the "but-for" causation standard for retaliation. See Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1340 (11th Cir. 2023).

[24] In her brief, Nolan argues "Graham did not force other teachers to communicate with him when they had issues as minor as a malfunctioning air conditioner in the classroom, instead, allowing the teachers to communicate with maintenance without going through his office." Doc. 35 at 43. The email from Graham states that Nolan should contact Mrs. Wyatt (identified as Graham's secretary, Doc. 37 at 3) with any similar issue. See Doc. 30-24. Nolan does not provide evidence that maintenance requests from others were handled differently – merely her own conclusion or speculation that no one else received a similar email. Doc. 34-1 at 199-200. Nolan describes this as harassment because Graham is letting her know that she is "being watched closer than the other teachers." Id. Nolan says she contacted maintenance and then received Graham's email for requests to go through his office. Doc. 35 at 12.

## C.    Hostile Work Environment (Count II)

Nolan's remaining claim is that she was subjected to a hostile work environment.[25] To prevail on a hostile work environment claim, a plaintiff must prove: (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment, and (5) the employer was responsible. Copeland v. Georgia Dep't of Corrections, 97 F.4th 766, 774-75 (11th Cir. 2024). Behavior that is merely unfair or rude, but not tied to a protected characteristic, does not support a hostile work environment. Hunsaker v. Found. Partners Grp., LLC, No. 6:18-cv-1996 ACC DCI, 2020 WL 10355118, at *11 (M.D. Fla. Dec. 23, 2020) (citing Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995)).

The School Board only argues about the third and fourth requirements, claiming Nolan cannot show harassment was based on a protected characteristic nor was it so severe or pervasive that it impacted the terms and conditions of her employment.[26]

---

[25] Nolan has not pled a retaliatory hostile work environment claim and separate pleading is required. Terrell v. Sec'y, Dep't. of Vets. Affs., 98 F.4th 1343, 1355-56 (11th Cir. 2024).

[26] There is no dispute Nolan belongs to a protected class based on gender, that the harassment described was unwelcome, and that, if proven, the School

The severe or pervasive requirement has both a subjective and objective element. Copeland, 97 F.4th at 775. There is no dispute about the subjective component, Nolan thought her work environment was hostile. Nolan stopped seeking supplemental pay roles that required interaction with Graham. She felt singled out and under additional scrutiny. Nolan testified she began to have anxiety and panic issues, which have continued.

The legal question concerns the objective component of a hostile work environment: whether a reasonable fact finder could conclude that Graham's conduct, as alleged, was either severe or pervasive enough to impact the terms and conditions of Nolan's employment? To assess the objective requirement, the Court views the totality of the circumstances based on four factors (although the factors themselves are not requirements): (1) frequency, (2) severity, (3) whether it is physically threatening or humiliating, and (4) whether it unreasonably interferes with job performance. Id. at 775-76 (citations omitted).

Nolan argues incidents both before and after her internal complaint support the hostile work environment claim. These include Graham's repeated inquiries about her marital status; Graham's behavior in the meeting Nolan requested to discuss schedule changes (Graham's questions about her personal life escalating to include racial inquires, calling her immoral, and threatening

_____

Board would be liable for the actions of Graham.

to have her teaching certificate revoked); Graham's behavior at the meeting with Nolan and Dillon (Graham admitting to repeatedly asking about marital status, being rude and physically aggressive towards Dillon, and threatening Dillon); Graham's response to the Equity Committee (admitting he asked Nolan about her marital status, but lying about how often and why he had asked, claiming Nolan had said she was in an open relationship); Graham's involvement in observing Nolan's classroom even though he was not supposed to be involved, communicating with her about the observation in a physically intimidating manner, stating it was his school, and he could do as he pleased; and multiple other incidents, albeit sporadic, involving yelling or belittling Nolan, indicating he was observing her closely, to communicate he had power over her employment, or could make her situation difficult (with policy reminders, insisting he participate in a meeting to discuss classroom observation, and attempted discipline). Despite Nolan's complaints and despite at least two witnesses (Dillon and Linskey) who could corroborate some of Graham's poor behavior towards Nolan, Graham was not disciplined. Nolan's complaints arguably resulted in more scrutiny for herself and gave Graham an opportunity to impugn her character.[27]

_____

[27] The School Board argues it is entitled to the <u>Faragher</u> defense, because after Nolan's complaint to the Equity Committee, Graham's questions about her marital status stopped. Taking facts in the light most favorable to Nolan, this misses the bigger point. Nolan had allegedly been treated badly and her job was

Nolan's version of the interactions with Graham, which must be credited here, paints a picture of ongoing and escalating intimidation from her boss, with limited help from her employer, despite her complaints and some witnesses. The problem starts with inquiries about marital status and escalates to threats about her job and heightened scrutiny of her performance. Graham's actions were humiliating or belittling more than once and sometimes occurred in front of others, such as when Graham threatened the union representative trying to help Nolan. Graham made clear he was the top authority on site, it was "his school."

While limited, Nolan has presented sufficient evidence that treatment was due to her gender. Nolan was repeatedly asked about her marital status, but Major was not. Nolan and Dillon, both women, were threatened by Graham, and there is no evidence males had similar experiences. Nolan has provided evidence that other women complained about Graham.

There are disputed issues of fact about the interactions between Nolan and Graham, and a reasonable person might conclude that Graham's actions,

---

threatened. When her union representative was involved in a follow up meeting, Graham treated them both badly, and threatened the union representative (would report her to the CIA, FBI, and school superintendent). Doc. 34-7 at 12. Graham was allegedly willing to lie to support his actions and the School Board investigation did not include or address Graham's poor behavior beyond the marital status questions. Nolan's experience was that Graham was allowed to behave badly without consequence.

even though spread out over several years, were enough to create an objectively hostile work environment. Accordingly, summary judgment as to the hostile work environment claim is denied.

## IV.    CONCLUSION

Nolan certainly describes a frustrating and challenging working relationship under Graham. If credited, much of what happened, should not have happened. However, despite the difficulties Nolan encountered, the Court finds Nolan has not presented viable claims for retaliation, gender or race discrimination and summary judgement is due as to those claims. But summary judgement is denied as to her hostile work environment claim, to allow a jury to make credibility decisions between the two versions of events, and, to the extent it credits Nolan's version, decide if it was sufficiently severe or pervasive.

Accordingly, it is hereby

**ORDERED:**

1.      Defendant's Dispositive Motion for Summary Judgment, Doc. 30, is granted in part and denied in part. Summary judgement is **GRANTED** in favor of the St. Johns County School Board as to Counts I, III, and IV of the Amended Complaint and **DENIED** as to Count II.

2. The Parties are ordered to attend mediation again as soon as possible, but no later than **March 14, 2025**.

The Parties will submit a joint status report specifying the mediator and mediation date, no later than **January 10, 2025**. The Parties will submit a status report within ten days after the mediation.

3. The case is **REMOVED** from the February 2025 trial calendar and the Final Pretrial Conference set for January 22, 2025, is **CANCELLED**. All other pending deadlines of the Case Management and Scheduling Order, Doc. 22, are **VACATED**, and will be reset if mediation is not successful.

**DONE AND ORDERED** in Jacksonville, Florida the 13th day of December, 2024.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record

23